**BROADCAST MUSIC, INC., et al., Plaintiffs–Appellants,**

v.

**CLAIRE'S BOUTIQUES, INC., d/b/a Claire's Boutiques, and d/b/a Arcadia, Defendant–Appellee.**

No. 91–1232.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 4, 1991.

Decided Dec. 11, 1991.

Nicole J. Klimisch, Robert G. Krupka (argued), Sharon E. Kohn, Kirkland & Ellis, Chicago, Ill., for plaintiffs-appellants.

Jeffrey P. DeJong, Gail J. Berritt, Altheimer & Gray, Chicago, Ill., Andrew H. Bart (argued), Pryor, Cashman, Sherman & Flynn, New York City, for defendant-appellee.

Monica L. Thompson, Keck, Mahin & Cate, Chicago, Ill., Bernard Korman, Ann Chaitovitz, American Soc. of Composers, Authors and Publishers, New York City, for American Soc. of Composers, Authors and Publishers, amicus curiae.

George E. Greer, Roberta R. Katz, Louisa Barash, Heller, Ehrman, White & McAuliffe, Seattle, Wash., for Muzak Ltd. Partnership, amicus curiae.

Before CUMMINGS, WOOD, Jr., and KANNE, Circuit Judges.

CUMMINGS, Circuit Judge.

When must the corporate owner of a chain of retail stores pay copyright license fees for playing radio broadcasts in its stores? Plaintiffs Broadcast Music, Incorporated ("BMI") and various named song publishers[1] sued defendant Claire's Boutiques, Incorporated ("Claire's") for violating copyrights in certain musical compositions. The plaintiff publishers own the copyrights in the compositions at issue but grant to BMI the right to license public performances of these compositions. Claire's, which owns and operates a chain of over 700 retail stores, defended BMI's allegations in the district court by claiming shelter in § 110(5) of the Copyright Act. Section 110(5) exempts under certain circumstances persons who play their radio or television in a public place if received by a single receiving apparatus of a kind commonly used in private homes. Both parties moved for summary judgment. The district court granted Claire's motion, and BMI appealed.

## I. FACTS

Pursuant to the district court's request, the parties stipulated to the following facts for the purposes of their summary judgment motions.

### A. *The Parties*

BMI is a non-profit performing rights organization expressly recognized by the Copyright Act. See 17 U.S.C. § 116(e)(3). Individual publishers grant to BMI a non-exclusive right to license public performance rights in their musical compositions. Besides BMI, the plaintiffs in this case own the copyrights to 88 musical compositions that are the subject of this action.[2]

Claire's owns and operates 719 stores under the name Claire's Boutiques and 30

---

1. As used herein, BMI also includes the 67 song publisher plaintiffs. The American Society of Composers, Authors and Publishers and Muzak Limited Partnership filed *amicus* briefs favoring reversal.

2. The first five songs listed on a schedule to BMI's complaint are:

| Song | Plaintiff Publisher |
| --- | --- |
| 1) "Shout" | Virgin Songs, Inc. |
| 2) "Sitting on the Dock of the Bay" a/k/a "Sittin' on the Dock of the Bay" | Irving Music, Inc. |
| 3) "This Old Heart of Mine (Is Weak For You)" a/k/a "This Old Heart of Mine" | Steve Agate Music, Division of Jobete Music, Inc. |

stores under the name Arcadia. These retail establishments are located throughout the United States and are open to the public during normal business hours. Claire's stores range in size from 458 square feet to 2000 square feet. The average size of a Claire's Boutique store is 861 square feet, and 628 of the Boutique stores are less than 1055 square feet. The average size of each Arcadia store is 2022 square feet, and 27 out of the 30 Arcadia stores are greater than 1055 square feet.

During fiscal year 1990, Claire's had net sales of $168,674,000 and earned $13,402,-000 in net income. The Claire's Boutiques stores accounted for the majority of these sales ($165,767,233).

### B. *Claire's Sound System*

Claire's has a policy to provide the following stereo components to each of its stores: a Radio Shack Optimus STA–20 5-watt stereo receiver, two Realistic Minimus 7 speakers, an indoor antenna, and speaker wire. As a general rule, Claire's ships a radio receiver to each new Claire's store.[3] General contractors install the speakers and associated wiring pursuant to corporate specifications designed to conceal the wiring as much as possible. Stereo receivers are a stock item furnished to each store as a matter of course based on a supply requisition form. When a receiver breaks, the store manager simply orders a replacement receiver from the corporate purchasing manager. In the three and a half year period from 1987 to July 1990, Claire's purchased at least 527 receivers, 1240 speakers, FM antennas, and speaker wire at a total cost of $108,112.42. Claire's current-ly owns and operates at least 669 receivers and 1338 speakers.

The individual Claire's Boutiques and Arcadia stores use the receivers provided by corporate headquarters to receive and play radio broadcasts during regular business hours. Prior to their acquisition by Claire's in October 1989, the Arcadia stores subscribed to a commercial background music service. In addition, 24 Claire's Boutiques stores had a trial subscription to a commercial background music service. Claire's ended both its subscriptions because it concluded that its employees preferred listening to the radio.

The receivers are ordinarily kept in a small storage room at the back of Claire's stores.[4] The door between this room and the selling area is typically closed during business hours. Two strands of speaker wire run from the speaker jacks in the back of the receiver to speakers in the store's selling area. Both strands run through a hole in the wall separating the storage room from the selling area. One strand is attached to a speaker that is hung from the ceiling in the rear corner of the selling area. The other strand of wire runs above the dropped ceiling and is connected to the second speaker which is also hung from the ceiling. The first speaker is an average of 5–15 feet from the receiver, and the second speaker is an average of 20–35 feet from the receiver. Both speakers are hidden by a decorative dropped ceiling.

### C. *The Parties' Dispute*

BMI claims that Claire's violates the Copyright Act by playing radio broadcasts

| Song | Plaintiff Publisher |
|---|---|
| 4) "Way You Make Me Feel" a/k/a "The Way You Make Me Feel" a/k/a "Hot Fever" | Michael Joe Jackson d/b/a Mijac Music |
| 5) "You Keep Me Hangin' On" | Steve Agate Music, Division of Jobete Music, Inc. |

**3.** Claire's decided to postpone radio playing in its new stores pending the outcome of this litigation. Therefore approximately 65 Claire's stores, which have opened since August 1990, do not have receivers.

**4.** In some stores, the receiver is kept in a closet rather than a storage room. In other stores, in which remodeling has not been completed, the receiver is kept behind the cash register counter. The parties focus their attention on the most common arrangement of receivers being placed in a separate storage room.

in its stores without first obtaining a license from BMI. BMI has offered to provide Claire's with a license at an annual cost of $240 for the first location and $45–$60 for each additional location. One license agreement would cover all of Claire's locations that use receivers to play radio broadcasts. For all the Claire's stores involved in this litigation, the annual BMI licensing fee would be $40,385, an average of $53.92 per store.

Claire's counter-offered to license only its stores that are in excess of 1055 square feet on the condition that BMI not seek to license those Claire's stores with less than 1055 square feet. BMI rejected Claire's counter-offer and commenced this litigation.

### D. The Trial Court Proceedings

BMI filed its complaint against Claire's on July 10, 1990, alleging 88 counts of copyright infringement. On September 5, 1990, Claire's filed an amended answer that included a counterclaim seeking declaratory judgment that Claire's is exempt from licensing requirements pursuant to 17 U.S.C. § 110(5). Claire's also raised several affirmative defenses, including copyright misuse, laches, and unclean hands.[5] On November 19, 1990, Claire's filed a motion for summary judgment seeking a ruling that it was exempt from liability under § 110(5). On December 3, 1990, BMI filed a cross-motion for summary judgment on the issue of Claire's liability for copyright infringement. The district court agreed with Claire's that it was exempt under § 110(5), granted Claire's motion for summary judgment, and dismissed the complaint on December 28, 1990. *Broadcast Music, Inc. v. Claire's Boutiques, Inc.*, 754 F.Supp. 1324 (N.D.Ill.1990).

## II. ANALYSIS

■ The district court's ruling was based on stipulated facts. The only issue raised on appeal—whether Claire's is exempt under § 110(5) of the Copyright Act—is a question of law subject to *de novo* review. Summary judgment will be affirmed only if Claire's is entitled to prevail as a matter of law on the basis of the stipulated facts. See *Campbell v. White*, 916 F.2d 421, 422 (7th Cir.1990), certiorari denied, —— U.S. ——, 111 S.Ct. 1314, 113 L.Ed.2d 248 (1991). Any necessary inferences from the facts must be drawn in the light most favorable to BMI. *Id.*

■ The owner of a copyright in a musical work has the exclusive right "to perform the copyrighted work publicly." 17 U.S.C. § 106(4). One obvious example of a public performance is a live musical concert before a substantial paying audience. A live concert, then, is an infringement unless it is licensed or unless an exemption applies. On the other hand, a rendition of a copyrighted song in the shower is not a public performance and therefore not an infringement, so that there is no need to obtain a license or search for an exemption. *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 155, 95 S.Ct. 2040, 2043, 45 L.Ed.2d 84 (1975).

The technologies of radio and television, which separate the performer from the audience, make it harder to specify what constitutes a public performance. By analogy, a radio station "performs a work publicly" when it sends out radio signals corresponding to that work because, like a live performer, the radio station decides what work is performed and directs that work to a substantial audience. But, more to the point of this case, does a store manager (or corporate owner) perform a work publicly when she merely receives and plays those radio signals for the benefit of her customers?

Under the Copyright Act of 1976, it is clear that the store manager does engage in a public performance. See *infra* at 1488. Some historical background, however, is necessary for a proper understanding of the "single receiving apparatus" exemption contained in § 110(5), which also first appeared in 1976. The Supreme Court addressed "public performance"

---

**5.** BMI moved to strike Claire's counterclaim and affirmative defenses. This motion was stayed pending resolution of the summary judgment motions.

questions in a series of three cases decided under the Copyright Act of 1909.[6] In *Buck v. Jewell–LaSalle Realty Co.*, 283 U.S. 191, 51 S.Ct. 410, 75 L.Ed. 971 (1931), the defendant hotel operator wired a master radio receiving set to each of the public and private rooms in his hotel. Patrons of the hotel could listen to the radio by switching on the loudspeaker in their room. Neither the defendant nor the owner of the radio station whose signal was being received had a license with the plaintiff to perform his song. The question for the Court was whether the hotel operator had performed the musical works in question. *Id.* at 195–196, 51 S.Ct. at 410–411. The Court, noting that the playing of a record is a performance under the Copyright Act of 1909, held that the reproduction of the radio waves into audible sound waves is also a performance. *Id.* at 200–201, 51 S.Ct. at 412–413. Thus Justice Brandeis concluded that the radio station owner and the hotel operator simultaneously performed the works in question. The Court's ruling became known as the "doctrine of multiple performances," with both the hotel and broadcasting station liable for infringement. See M. Nimmer, 2 Nimmer on Copyright, § 8.18 (1991).

The Supreme Court in *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), expressly limited the *Jewell–LaSalle* case to its facts. *Id.* at 396 n. 18, 88 S.Ct. at 2087 n. 18. *Fortnightly* dealt with issues raised by the burgeoning cable television industry. The cable television company in *Fortnightly* received the signals of television broadcasting stations, amplified them, and then transmitted them by coaxial cable to paying subscribers. *Id.* at 392, 88 S.Ct. at 2085. The Court in *Fortnightly* decided that the cable company's actions did not constitute a performance under the 1909 Copyright Act. The opinion acknowledged that an initial broadcast by a television station is a performance; however, the viewer of the broadcast is merely a "passive beneficiary" of the performance. *Id.* at 398–399, 88 S.Ct. at 2085–2089. The Court then concluded that the cable company's actions were more like a passive viewer than an active broadcaster or performer. *Id.* at 399, 88 S.Ct. at 2089.

Most relevant to the present case, the Supreme Court in *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 95 S.Ct. 2040, dealt with a restaurant owner who played a radio with four speakers in his restaurant. Defendant Aiken owned a fast-food restaurant where customers usually stayed no more than ten or fifteen minutes. Following *Fortnightly*, the Court considered that the only performance in this situation is initiated by the radio station, and Aiken's largely passive act of turning on a radio was held not to be a performance. *Id.* at 161–162, 95 S.Ct. at 2046–2047. Since Aiken did not perform, he did not infringe anyone's copyright by playing his radio in his restaurant. The Court reasoned that a contrary ruling would result in practical problems because of the large number of small business establishments in the United States. *Id.* at 162, 95 S.Ct. at 2046. As an economic matter, the Court felt that a copyright owner was adequately compensated for his work through his license fee with the radio station. *Id.* at 163, 95 S.Ct. at 2047.

If *Aiken*'s rationale were to apply in our case, the radio playing by Claire's store managers would not be performances and BMI would have no case. Congress, however, rejected *Aiken*'s rationale, if not its result, in the Copyright Act of 1976. The drafters defined "perform" and "perform publicly" broadly in 17 U.S.C. § 101:

> To "perform" a work means to recite, render, play, dance, or act it, either directly or by means of any device or process * * *.
>
> \*        \*        \*        \*        \*        \*
>
> To perform or display a work "publicly" means—
>
> (1) to perform or display it at a place open to the public or at any place

---

**6.** The 1909 Act also gave a copyright owner the exclusive right to perform her work publicly, except that the right only applied to for-profit performances. See M. Nimmer, 2 Nimmer on Copyright § 8.18, at 8–193 n. 4 (1991).

where a substantial number of persons outside of a normal circle of a family and its social acquaintances is gathered; or

(2) to transmit or otherwise communicate a performance or display of the work to a place specified by clause (1) or to the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

Under these particular definitions, the restaurant owner in *Aiken* "performed" the works in question by "playing" them on a "device"—the radio receiver. Furthermore, the performances were "public" because they took place at a restaurant "open to the public." For the same reasons, Claire's, through the actions of its employees, engages in public performances of copyrighted works when it plays the radio during normal business hours.

Even though Congress rejected the Supreme Court's conclusion that the defendant in *Aiken* had not performed, the legislative history reveals that Congress did not intend to make him liable for copyright infringement. See *H.R.Rep.* No. 94–1476, 94th Cong., 2d Sess. 86, 87 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5701 [hereafter House Report] ("Under the particular fact situation in the *Aiken* case * * * it is intended that the performances would be exempt under clause (5)"). Section 110(5) of the new act enabled Congress to achieve this result: ·

Notwithstanding the provisions of section 106, the following are not infringements of copyright:

\*  \*  \*  \*  \*  \*

(5) communication of a transmission embodying a performance or display of a work by the public reception of the transmission on a single receiving apparatus of a kind commonly used in private homes, unless—

(A) a direct charge is made to see or hear the transmission; or

(B) the transmission thus received is further transmitted to the public.

17 U.S.C. § 110(5). Because it helps explain the exemption and because BMI and Claire's argue over its meaning and relevance, a significant portion of the legislative history is quoted below:

[The exemption's] purpose is to exempt from copyright liability anyone who merely turns on, in a public place, an ordinary radio or television receiving apparatus of a kind commonly sold to members of the public for private use.

The basic rationale of this clause is that the secondary use of the transmission by turning on an ordinary receiver in public is so remote and minimal that no further liability should be imposed. In the vast majority of these cases no royalties are collected today, and the exemption should be made explicit in the statute. \* \* \*

The majority of the Supreme Court in the *Aiken* case based its decision on a narrow construction of the word "perform" in the 1909 statute. This basis for the decision is completely overturned by the present bill and its broad definition of "perform" in section 101. \* \* \* [F]urther transmission of a broadcast to the public is considered an infringing act.

Under the particular fact situation in the *Aiken* case, assuming a small commercial establishment and the use of a home receiver with four ordinary loudspeakers grouped within a relatively narrow circumference from the set, it is intended that the performances would be exempt under clause (5). However, the Committee considers this fact situation to represent the outer limit of the exemption, and believes that the line should be drawn at this point. Thus, the clause would exempt small commercial establishments whose proprietors merely bring onto their premises standard radio or television equipment and turn it on for their customers' enjoyment \* \* \*. Factors to consider in particular cases would include the size, physical arrangement, and noise level of the areas within the establishment where the transmissions are made audible or visible, and the extent to which the receiving appa-

ratus is altered or augmented for the purpose of improving the aural or visual quality of the performance for individual members of the public using those areas. House Report at 86–87, reprinted in 1976 U.S.C.C.A.N. 5659, 5700–5701. The Conference Report adds:

the intent of the conferees [is] that a small commercial establishment of the type involved in *Aiken,* which merely augmented a home-type receiver and which was not of sufficient size to justify, as a practical matter, a subscription to a commercial background music service, would be exempt.

H.R.Rep. No. 94–1733, 94th Cong., 2d Sess. 75 (1976), reprinted in 1976 U.S.C.C.A.N. 5810, 5816 [hereafter Conference Report].

The legislative history reveals several reasons why Congress passed the § 110(5) exemption. Congress thought it unfair to impose liability on unsuspecting small business persons. Congress believed also that it was impractical to require small organizations to enter into licensing agreements with performing rights organizations. The secondary use of radio broadcasts in small establishments, Congress also recognized, would have only a minimal effect on authors' incentives to create new works.

On the face of the statute, the exemption is available only if (1) a single receiving apparatus is used, (2) the single receiving apparatus is of a kind commonly used in private homes, (3) the transmission is provided free of charge, and (4) the transmission is not "further transmitted" to the public. The parties agree that Claire's does not charge for the privilege of listening to the radio broadcasts in its stores. The parties contest, however, the applicability of the other three elements required by § 110(5). They also disagree on the proper meaning and relevance of the legislative history.

BMI argues first that the district court erred in considering Claire's operations on a store-by-store basis. BMI contends that Claire's actions must be considered as a whole. When viewed in this light, according to BMI, Claire's must be found liable for copyright infringement because it oper-

ates at least 669 receivers, not a "single receiving apparatus" as required by § 110(5). BMI also claims that Claire's cannot be exempt from copyright infringement because, when viewed as a whole, it fails the so-called "small business" and "background music service" tests. Finally, BMI claims that, even if Claire's operations are viewed on a store-by-store basis, Claire's cannot claim the § 110(5) exemption because its receiving apparatus is not of a type commonly used in private homes and also because the transmission received is further transmitted into a separate room. We address these contentions in turn.

### A. The "Single Receiving Apparatus" Issue

■ Section 110(5) does not discuss how to treat chain stores such as Claire's. BMI contends that Claire's cannot claim that it uses a "single receiving apparatus" for the simple reason that, on a corporate-wide basis, it uses 669 receivers. Claire's counters that its activities must be viewed on a store-by-store basis and that it is stipulated that only one receiver is used in each store.

The district court concluded that the legislative history showed that Congress did not intend to exclude chain stores from claiming the § 110(5) exemption. This conclusion was based on the fact that Congress intended to reaffirm that the exemption would apply to the situation in *Aiken.* As the district court opinion in *Aiken* noted, the defendant's restaurant was part of a chain. *Twentieth Century Music Corp. v. Aiken,* 356 F.Supp. 271, 272 (W.D.Pa. 1973). Therefore, the district court below reasoned, "Congress cannot have intended [that courts examine chains as a whole] if it also intended to reaffirm the result in *Aiken.*" 754 F.Supp. at 1336.

We agree with BMI that the district court's analysis of this issue cannot be accepted. The Supreme Court's opinion in *Aiken* focused exclusively on one store and one receiver. It is the Supreme Court's decision in *Aiken,* not the district court's decision, that Congress naturally focused on when considering the issues raised by the § 110(5) exemption. Moreover, the leg-

islative history uses the word "proprietor," [7] implying that Congress only considered companies with one location or storefront.

Congress did not address, in either the statute or any legislative history, the precise issue of whether all the receivers of a commonly owned organization are to be counted for the purposes of § 110(5), or only those receivers in a particular location. Section 110 provides exemptions to "infringements of copyright," with no reference to whether corporate actions that infringe a copyright are to be considered as a whole. Some subsections refer specifically to individuals,[8] whereas other subsections refer specifically to groups.[9] Subsection (5), on the other hand, does not contain a description of what types of individuals or groups are entitled to freedom from copyright liability. This omission presumably implies that anyone could benefit from the exemption. Indeed, under 17 U.S.C. § 501, "Anyone who violates any of the exclusive rights of the copyright owner * * * is an infringer of the copyright." "Anyone" of course includes both corporate entities and individual persons.

In one sense, it seems more appropriate to consider Claire's as the infringer as opposed to its individual store managers. Claire's instituted and has carried out a policy of playing radio music without a license in its public stores. Its store managers, although they may have the discretion to choose which station to play, are merely following corporate policy when they switch on the receivers in their stores.

The legal fiction of corporate personhood was developed precisely for this type of case.

That Claire's is the potential infringer does not mean, however, that all its receivers must be counted together for the purposes of § 110(5). The language of the statute speaks of one performance of one work, describes the type of receiving apparatus that may be used, and disallows an admission charge or further transmission. The statute asks: under what circumstances was the radio used to perform this one work? Was one receiving apparatus used, was a charge made, was the work further transmitted? The statute does not ask how many receiving apparatuses were used to receive a number of different works. The language of the statute thus strongly suggests that the proper analysis should be limited to the area where a single work is performed.

This case would be different if Claire's itself initiated the broadcast of an identical work to each of its 669 stores. Then Claire's would be more like a radio station owner or broadcaster. It would also be a different case if Claire's told its managers to tune to a particular station—Claire's would in that case also have some indicia of a broadcaster. In this case, however, the individual store managers simply tune the receivers to the station of their choice.[10] By using the phrase "single receiving apparatus," Congress simply wanted to foreclose the unlicensed playing of more than one receiver at a single geographic site.

---

7. The House Report states that "the clause would exempt small commercial establishments whose proprietors merely bring onto their premises standard radio or television equipment * * * but it would impose liability where the proprietor has a commercial 'sound system' installed." House Report at 87, 1976 U.S.C.C.A.N. at 5701. A proprietor is one who has the legal right or exclusive title to property or a business, usually a business owned and controlled exclusively by one person. Black's Law Dictionary 1220 (6th ed. 1990).

8. For example, § 110(1) exempts the "performance or display of a work by instructors or pupils in the course of face-to-face teaching activities of a nonprofit educational institution."

9. Section 110(6) exempts in certain circumstances the "performance of a nondramatic musical work by a governmental body or a nonprofit agricultural or horticultural organization * * *."

10. BMI notes that it was stipulated that "[s]ince there are 23 Claire's Boutique stores in the Chicagoland area, it is likely that at least some play the same radio station simultaneously" (Br. A–38). Assuming that it is true that some of the stores received the same transmission, this does not mean that Claire's loses because it uses more than one receiving apparatus to receive that work. Our conclusion is that unless Claire's acted like a broadcaster, the analysis must be limited to the single business site where the receiving apparatus operates.

An examination of the history and policy behind the § 110(5) exemption bolsters our conclusion that the exemption in this case was properly limited to each individual store. The problem addressed by this exemption is where to draw the line between uses of copyrighted works that should be considered infringements and uses that should not be considered infringements. Although Congress broadly defined "public performances" in the Copyright Act of 1976, it was aware that some performances were more public than others. Those performances that are less public are those where the "secondary use * * * is so remote and minimal that no further liability should be imposed." House Report at 86, 1976 U.S.C.C.A.N. at 5700. Congress decided that the way to judge the benefit to the otherwise infringing person (assuming that no charge was made) was to focus on the type of receiver used—was there a "commercial sound system?" Since a sound system exists in only one geographical area, our analysis is likewise limited. When viewed one store at a time, it is clear that Claire's only used a single receiving apparatus. This result is consistent with Congress' intent because, like the defendant in *Aiken,* each individual store manager receives only minimal benefit from her receiver.

### B. *The "Small Business" and "Background Music Service" Tests*

■ BMI also relies on the legislative history and several reported cases for the proposition that § 110(5) cannot apply to a large profitable business such as Claire's. The legislative history refers to the exemption being for "a small commercial establishment * * * not of sufficient size to justify, as a practical matter, a subscription to a commercial background music service * * *." Conference Report at 75, 1976 U.S.C.C.A.N. at 5816. BMI asserts that the case law interpreting this language sets forth two separate requirements: that Claire's be a "small business" and that Claire's not be of a size and nature that would as a practical matter justify a subscription to a background music service. It is obvious that these two so-called tests collapse into one issue: how does the financial size of the alleged infringer relate to the § 110(5) exemption?

The legislative history certainly repeats the phrase "small commercial establishment" in several places. What is unclear is whether the word "small" refers to the physical size of an individual storefront or the financial size of the company that owns the storefront. Language in the history regarding the size being insufficient to "justify, as a practical matter, a subscription to a background music service" suggests that financial size is the important consideration. Other parts of the legislative history suggest the opposite: "a small commercial establishment * * * which merely augmented a home-type receiver," *id.* (suggesting one physical establishment and one receiver); "the clause would exempt small commercial establishments whose proprietors merely bring onto their premises standard radio or television equipment and turn it on," House Report at 87, 1976 U.S.C.C.A.N. at 5701 (same).

Ultimately we need not resolve this issue. As the district court stated, "Congress chose to effectuate [the intent to exempt small commercial establishments] by drawing a distinction based on the type of sound equipment utilized and the nature of the transmission." 754 F.Supp. at 1333. Any rule developed under § 110(5) based on the financial strength of the company seeking the exemption would be directly contrary to the terms of the statute. The statute speaks only of 1) the number of receiving apparatuses used, 2) whether the sound system is of a type commonly used in private homes, 3) whether music is further transmitted, and 4) whether admission was charged. Legislative history cannot be used to invent rules totally unrelated to the language of the statute. It is appropriate instead for the purpose of clarifying an ambiguous statute or, what is often the same thing, applying the statute to a situation not clearly foreseen by the drafters of the statute. *In re Sinclair,* 870 F.2d 1340 (7th Cir.1989).

It is true that a holding that the financial strength of Claire's is irrelevant contra-

dicts the language of several other cases. These cases, however, typically rely independently on an analysis of the stereo system that the infringer had installed in its store.

This Court mentioned but did not discuss the propriety of a "small business" test in *International Korwin Corp. v. Kowalczyk*, 855 F.2d 375 (1988). The defendant in *Kowalczyk* had been found liable for playing the radio in his restaurant, and on appeal he did not contest that determination but only questioned whether he could be liable for willful infringement and attorney's fees. The small business test was mentioned only in the context of describing the lower court's opinion. The district court in *Kowalczyk* did state that "given both its physical size and substantial revenues, [defendant] is a large enough establishment to accommodate a background music service." *International Korwin Corp. v. Kowalczyk*, 665 F.Supp. 652, 658 (N.D.Ill.1987). However, the district court also independently found that the defendant did not use a receiving apparatus of a kind commonly used in private homes, and also further transmitted the music to the public. *Id.* at 657–658. Either of these holdings would have sufficed to deny to defendant the application of the exemption.

Indeed, no case has relied solely on the financial size or ability of the defendant as a reason for denying the application of § 110(5). The two reported Circuit cases that consider the exemption both rely on alternative grounds for finding that § 110(5) did not apply. In *Broadcast Music, Inc. v. United States Shoe Corp.*, 678 F.2d 816 (9th Cir.1982), the court held that the defendant failed to qualify for the exemption "because each store has a commercial monaural system, with widely separated speakers of a type not commonly used in a private home, *and* the size and nature of the operation justifies the use of a commercial background music system." *Id.* at 817 (emphasis supplied). Similarly, the Second Circuit based its affirmance of a finding that § 110(5) did not apply to a particular defendant on both the physical size of the defendant's establishment and the financial strength of the defendant. *Sailor Music v. Gap Stores, Inc.*, 668 F.2d 84 (2d Cir.1981), certiorari denied, 456 U.S. 945, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982). District court cases relied upon by BMI also do not rest their decision solely on the defendant's revenues and ability to subscribe to a commercial background music service.[11] Rejection of a rule based on the financial strength of the defendant does not require a different result in any of these cases.

In sum, BMI is not entitled to reversal just because Claire's is a large and profitable business. The district court properly held that these considerations, notwithstanding the conclusions of other courts, are not relevant under § 110(5).

### C. *Commonly Used in Private Homes*

■ BMI also contends that, even when considered on a store-by-store basis,

---

**11.** See *Crabshaw Music v. K–Bob's of El Paso, Inc.*, 744 F.Supp. 763 (W.D.Tex.1990) (Exemption does not apply because the sound system had eleven speakers and was of a commercial type, but also noting that the restaurant grossed between $800,000 and $900,000 in revenues); *Gnossos Music v. DiPompo*, 13 U.S.P.Q.2d 1539, 1989 WL 154358 (D.Me.1989) (Exemption does not apply for the independent reasons that a sound system with 8 to 10 speakers is not a kind commonly used in private homes, that the defendant further transmitted the music, and the defendant is not a small commercial establishment); *Merrill v. Bill Miller's Bar-B-Q Enterprises, Inc.*, 688 F.Supp. 1172 (W.D.Tex.1988) (Exemption does not apply for the independent reasons that a system using Muzak stereo speaker grilles and 40 feet of speaker wire was not of a type commonly used in private homes, the music was further transmitted, and defendants were of a sufficient size to justify a subscription to a commercial background music system); *Merrill v. County Stores, Inc.*, 669 F.Supp. 1164 (D.N.H.1987) (Exemption does not apply because a system with 14 to 15 speakers covering 13,000 square feet of public selling area and that is also integrated with the store's telephone network is not a kind commonly used in private homes and also because defendant's $2.5 million revenue stream means it is not a small commercial establishment); *Lamminations Music v. P & X Markets, Inc.*, 1985 Copyright L.Rep. (CCH) 19,555, ¶ 25,790, 1985 WL 17704 (N.D.Cal.1985) (Exemption does not apply because system with 6 to 10 speakers covering 10,000 to 14,500 square feet of area is not of a kind commonly used in private homes, because the music was further transmitted, and because defendant was of sufficient size to warrant use of a commercial background music system).

Claire's does not use a "receiving apparatus of a kind commonly used in private homes" (a "home-type system"). The district court, after a thorough analysis of a number of different factors, concluded that Claire's used a home-type system in its stores.

The phrase "receiving apparatus" is somewhat unclear and could refer either to the receiver itself or to the entire stereo system, including the receiver, speakers, antenna, and wiring. We conclude that the entire system should be examined for the following reasons. Congress could have, as it does in the legislative history, simply used the word "receiver" if it had wanted to limit the analysis. In addition, "apparatus" is defined as "the totality of means by which a designated function is performed * * * [or] a group of machines used together * * * to accomplish a task." American Heritage Dictionary 120 (2d ed. 1982). A stereo system fits neatly into this definition of apparatus; it uses all its components to perform the task of converting radio waves into audible sound waves.

■ Because we examine the entire stereo system, there are two ways a company can fall out of the § 110(5) exemption for failure to use a home-type system. If the company uses any non-home-type components in its stereo system, then the system is not home-type. Analysis does not end, however, if all the components are home-type. The company also may not claim the exemption if it configures and uses home-type components in a manner not commonly found in a home. See *Hickory Grove Music v. Andrews*, 749 F.Supp. 1031, 1037 (D.Mont.1990).

The components in this case are home-type. The receiver is small, measuring approximately 10 inches by 7 inches by 3 inches and delivering only 5 watts of power. Its list price is $129.95, and it is capable of driving only two speakers. Although affidavits from an expert (i.e., someone experienced in the business of selling stereo systems to both homes and businesses) would be helpful in cases such as these, the district court properly concluded that this type of receiver is commonly used in private homes. The speakers used by Claire's are similarly small (7" by 5" by 4") and of limited power. Their list price is $49.95 each, and they are designed either to stand on a table or be mounted on a wall or ceiling. The speaker wire used is 18–gauge and is the type recommended for use in the speaker's manual. The antenna is similarly limited, retailing for only $2.97. When examined individually, all these components are home-type.

The next issue to consider is whether Claire's has configured home-type components in a way not commonly found at home. The district court examined the following factors relating to the system's configuration: number of speakers used, manner in which the speakers are installed, use of concealed wiring, distance of speakers from the receiver, and integration of the stereo system with other technologies. In this case, these factors do not all point in the same direction: the dropped speakers and concealed wiring point toward denying the exemption, whereas the limited number of speakers used (2), the relative closeness of the speakers to the receivers (5–35 feet), and the lack of integration of the system to other technologies point toward allowing the exemption. It is therefore appropriate to evaluate the relative weight to give each factor.

Legislative history is a proper guide in interpreting the somewhat ambiguous notion of a home-type system. In this case, the history reveals that Congress considered the stereo configuration in *Aiken* to represent the "outer limit" of the exemption. That stereo system consisted of a radio with outlets to four "loudspeakers" in the ceiling. The restaurant in *Aiken* was of the "fast-food" variety and only accommodated about 40 patrons. Although not mentioned in the legislative history or in the *Aiken* case at any level, the parties apparently agree that the restaurant in *Aiken* was 1055 square feet in size, with a serving area of 620 square feet.

Although the legislative history nowhere suggests a hard and fast rule, it is apparent that Congress intended the exemption to apply only to stereo systems that pro-

duce music over a limited area. First, the outer limit of *Aiken* is described as a radio set with four speakers "in a narrow circumference" around it. The history also states several times that the exemption is for "small commercial establishments." As mentioned above, considerations of financial size are irrelevant to our analysis. The physical size of an establishment, however, is relevant as indicative of the reach of a stereo system. Systems commonly used in homes only cover a limited area (usually only one room).[12] The legislative history explicitly makes size a relevant factor: "factors to consider in particular cases [include] the size * * * of the areas within the establishment where the transmissions are made audible." [13]

■ Claire's stores are small. 631 out of 749 of Claire's stores are less than 1055 square feet. The smallest store is 458 square feet; the largest store is 3300 square feet. The parties stipulate that one speaker averages five to fifteen feet from the receiver, and the other speaker averages twenty to thirty-five feet from the receiver. The fact that the broadcast of music in this case covers these small areas strongly indicates that the stereo system is of a kind commonly used in private homes. We do note that Claire's larger stores (greater than 2000 square feet) are closer to exceeding the size of a typical home and thus present closer cases. Even the larger stores, however, are not of a sufficiently large size to deny automatically application of the exemption.

The legislative history also lists as a relevant factor "the extent to which the receiving apparatus is altered or augmented for the purpose of improving * * * the performance * * *." Claire's has not altered or augmented the stereo system in any fashion in this case. The system has not been integrated with a public address or telephone system. Only two speakers are used, the maximum that the receiver can handle without alteration. This factor indicates that the configuration is home-type.

■ Two factors weigh in BMI's favor: the hiding of the speakers in a dropped ceiling and the concealment of the speaker wires. We agree with the district court that these factors should be accorded only minimal weight. The important considerations in determining whether a system is home-type are the type and sophistication of the equipment used, the size of the area in which the broadcast is audible, and whether the equipment has been altered, augmented, or integrated in some fashion. One might argue that since most homeowners do not drop speakers from the ceiling or conceal speaker wire in the ceiling, a system with these characteristics is not home-type. But Congress intended to preserve the exemption for the system in *Aiken* that had loudspeakers in the ceiling and presumably included hidden wiring. In addition, the legislative history focuses on the quality and scope of the broadcast as determining factors—the hiding of the wire and of the speakers is only marginally relevant to analysis of these factors.

■ BMI also argues that Claire's use of a corporate policy to coordinate the installation and replacement of the sound systems in its stores means that the systems cannot be considered home-type. This argument is without merit. The manner in which a system is installed is irrelevant to the determination of whether it is a home-type system. Claire's uses a home-type system in its stores. The system consists of simple components, it broadcasts over a small area, and it is not augmented or improved in any fashion.

---

**12.** The size of an establishment is relevant only as evidence of the scope of the stereo system. A store can show that a particular stereo system only covers a specific, limited portion of its total square footage.

**13.** Although we agree that the *financial* size of an establishment is irrelevant, we disagree with the district court's conclusion that the *physical* size of the establishment is not a relevant concern under § 110(5). See 754 F.Supp. at 1332–1334. As the discussion above indicates, this consideration does not bring into play a contradictory rule but rather gives content to what Congress meant by the term "receiving apparatus of a kind commonly used in private homes."

### D. *Further Transmission*

██ BMI's final argument is that Claire's further transmits the music broadcasts it receives in its stores and therefore fails to qualify for the § 110(5) exemption. The phrase "further transmitted" is not defined in the Copyright Act. To "transmit" is "to communicate [a performance] by any device or process whereby images or sounds are received beyond the place from which they are sent." 17 U.S.C. § 101. A radio station transmits its broadcasts, which are received by numerous radio sets. The question in this case is whether Claire's further transmits the broadcast it receives.

BMI argues that "it is undisputed that Claire's causes sounds to be received beyond the place where the performance is initially received" (Br. 39). This argument assumes that the performance is initially received at the receiver and then "further transmitted" via wire to other areas. Whatever its technical merits, this view of "further transmission" is contrary to the legislative history. The system in *Aiken* consisted of a radio set connected, presumably by wires, to four speakers. Congress intended such a system to be exempt under § 110(5). Yet BMI's proposed rule would deny the exemption to the store in *Aiken*. In addition, the statute uses the term "receiving apparatus," which, as discussed above, encompasses not just the receiver but all the components of an integrated music system. It is sensible to consider that the entire receiving apparatus, and not just the receiver, "receives" the performance.

BMI refines its argument by suggesting that the fact that the receiver is placed in a back room separate from the selling area means that the music is further transmitted. This argument also fails. The nature of the transmission does not change because the speaker wire passes over or through a wall. If Congress wanted the rule to be that the receiver must be in the same room as the speaker for the exemption to apply, it could have easily said so.

██ To further transmit a performance must mean more than to run speaker wire through a wall. It must entail the use of some device or process that expands the normal limits of the receiver's capabilities. We recognize that this construction of "further transmission" means that most systems that further transmit also are not home-type. But since it is conceivable that even a home-type component could further transmit under this approach, the requirement of no "further transmission" is not mere surplusage.[14]

### III. CONCLUSION

A recurring theme in BMI's argument is that Congress never intended § 110(5) to apply to multimillion dollar corporations such as Claire's. This may be so, but the job of this Court is to apply the laws passed by Congress, and not to enforce a generalized and vague notion of intent. In any event, Congress' intent to limit the exemption to financially small organizations is far from clear. The language of § 110(5), as well as most of its legislative history, is concerned with the quantity and quality of the receiving equipment used—is there more than one, is it home-type, does it further transmit? Congress, it seems, was not so much concerned with whether an establishment could afford a license but rather with whether the nature of the sound system was such that the performance it renders is more justly considered public in the common-sense, if not technical copyright, notion of that term. The sound

---

**14.** We recognize that other cases find "further transmission" to occur solely because the speakers were placed in a different room than the receiver. See *International Korwin Corp. v. Kowalczyk,* 665 F.Supp. 652, 657 (N.D.Ill.1987), affirmed, 855 F.2d 375 (7th Cir.1988); *Gnossos Music v. DiPompo,* 13 U.S.P.Q.2d 1539, 1542, 1989 WL 154358 (D.Me.1989); *Merrill v. Bill Miller's Bar–B–Q Enterprises, Inc.,* 688 F.Supp. 1172, 1176 (W.D.Tex.1988); *Lamminations Mu-*

*sic v. P & X Markets, Inc.,* 1985 Copyright L.Rep. (CCH) 19,555, 19,556 ¶ 25,790, 1985 WL 17704 (N.D.Cal.1985); *Rodgers v. Eighty Four Lumber Co.,* 617 F.Supp. 1021, 1022 n. 1 (W.D.Pa.1985); *Sailor Music v. Gap Stores, Inc.,* 516 F.Supp. 923 (S.D.N.Y.1981), affirmed, 668 F.2d 84 (2d Cir. 1981), certiorari denied, 456 U.S. 945, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982). None of these cases relied solely on a finding of further transmission to support its holding.

**1496**

system used by Claire's passes the statutory tests for exemption, and therefore the judgment below for Claire's is affirmed.