**EDISON BROTHERS STORES, INC., Appellee,**

v.

**BROADCAST MUSIC, INC., Appellant.**

**No. 91–2115.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 7, 1991.

Decided Jan. 13, 1992.

**1420**

Johnathan Zavin, New York City, argued (Scott M. Martin and Judith Saffer, New York City, Jim J. Shoemake and Kurt S. Odenwald, St. Louis, Mo., on brief), for appellant.

Michael A. Kahn, San Francisco, Cal., argued (Katharine Livingston and J. Daniel Sharp, San Francisco, Cal., and Robert T. Haar, St. Louis, Mo., on brief), for appellee.

Before McMILLIAN, JOHN R. GIBSON and BOWMAN, Circuit Judges.

BOWMAN, Circuit Judge.

Broadcast Music, Inc. (BMI), appeals the District Court's[1] decision to grant summary judgment in favor of Edison Brothers Stores, Inc., in Edison's suit for a declaratory judgment that its stores qualify for an exemption from the vesting of exclusive rights of performance in the owners of copyrighted works. *See Edison Bros.* *Stores, Inc. v. Broadcast Music, Inc.,* 760 F.Supp. 767 (E.D.Mo.1991). We affirm.[2]

The relevant facts are not in dispute. BMI is a performing rights organization that collectively licenses, as assignee of the rights of its copyright-holding clients (primarily publishers and songwriters), the public performance of such clients' copyrighted works.

Edison owns a chain of approximately 2500 retail clothing and shoe stores doing business as Chandlers, Jeans West, Fashion Conspiracy, Size 5–7–9 Shops, J. Riggins, Bakers, the Wild Pair, and others. Most of Edison's stores operate a single radio receiver with two attached shelf speakers to play radio broadcasts in the stores for the enjoyment of employees and customers. The equipment is simple and inexpensive. Edison has promulgated a radio usage policy and requires the adherence of these stores to the rules therein. The District Court summarized the policy as follows:

1. Only simple, low grade radio-only receivers are to be used.
2. Only two speakers may be attached to a radio receiver.
3. The speakers must be placed within 15 feet of the receiver.
4. Speakers that are built into the walls or ceilings must not be used. Only portable box speakers are allowed.
5. [Edison will a]dvise each store manager that they are not to use tapes, cassettes, or any other type of recording equipment in their stores. They are to play the radio only.

*Edison Bros. Stores,* 760 F.Supp. at 769–70, *quoted in* Brief of Appellee at 7. BMI has submitted no evidence that any of the Edison stores to which the radio usage policy applies have failed to comply with it.

Approximately 220 of Edison's stores have more sophisticated audio and video

---

1. The Honorable John F. Nangle, Senior United States District Judge for the Eastern District of Missouri.

2. In its complaint, Edison also claimed that BMI was equitably estopped from attempting to collect license fees because of the prior dealings of the parties. Complaint at ¶ 19, *reprinted in*

Joint Appendix A–7, A–13. The District Court did not reach this issue. Edison asks this Court to remand for consideration of the estoppel issue should we reverse the decision of the District Court. Because we are affirming that decision, a remand is unnecessary.

systems or subscribe to commercial music services. Edison pays license fees to BMI or to commercial services licensed by BMI or other performing rights organizations for the music played in these stores. In recent years BMI approached Edison about licensing the remaining stores in its chain. Negotiations between the two parties evidently broke down, and Edison filed suit in District Court seeking declaratory relief. The court, agreeing with Edison's position, declared that the radio systems in use at Edison's unlicensed stores qualified for the so-called homestyle exemption to the exclusive performance rights that copyright owners enjoy under federal law. BMI appeals.

In reviewing on appeal a district court's decision to grant summary judgment, we are governed by the same standard that governed the court below. *McCuen v. Polk County, Iowa*, 893 F.2d 172, 173 (8th Cir.1990). We therefore will affirm the District Court unless we find there remain genuine issues of material fact, in which case a trial would be required, or that the District Court erred in deciding that Edison was entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). BMI and Edison both filed motions for summary judgment and thus apparently agree there are no disputed issues of material fact. Therefore we are left with a purely legal question involving interpretation of the Copyright Act.

## I.

Under the Copyright Act, the owner of the copyright of a musical work has the exclusive right, among other rights, to perform the copyrighted work publicly. 17 U.S.C.A. § 106(4) (West Supp.1991). The Act, however, provides exemptions for certain performances. 17 U.S.C. § 110 (1988). Among the acts that are not "infringements of copyright" is the following:

> communication of a transmission embodying a performance or display of a work by the public reception of the transmission on a single receiving apparatus of a kind commonly used in private homes, unless—

> (A) a direct charge is made to see or hear the transmission; or

> (B) the transmission thus received is further transmitted to the public[.]

*Id.* § 110(5). The issue before the District Court, and now before us, is whether Edison's 2000–plus radio receivers, each with two attached speakers and each operated in a different store, qualify for this homestyle exemption. BMI insists that, for several reasons, the exemption is unavailable to Edison.

Clearly, each radio in an Edison store is a "single receiving apparatus" and is "communicat[ing] ... a transmission embodying a performance ... of a work by the public reception of the transmission." The receivers in the Edison stores are tuned to local radio stations and play anything and everything, including musical works, that the radio stations broadcast while the stores' receivers are on. No "direct charge is made to see or hear the transmission," and there is no contention that the broadcast is "further transmitted to the public" beyond the stores.

The sticking point for the parties, and the basis for BMI's first argument, is Edison's multiple locations, each employing a single receiver and two speakers in conformity with the company's radio usage policy. BMI argues that the statutory requirement that the transmission be received "on a single receiving apparatus of a kind commonly used in private homes" is not satisfied by this arrangement; although BMI concedes that an individual receiver and speaker set-up in one store may fit within the exemption, it takes the position that Edison lost section 110(5) protection as soon as it installed the second receiving apparatus in another of its stores. BMI contends that the statute requires that we consider the equipment of any one owner *in toto*, and not on a per-store basis, when we decide whether or not the exemption applies and find (as of course we would if we did as BMI suggests) that Edison is not in fact operating a "single receiving apparatus" within the meaning of the statute.

■ We cannot accept BMI's interpretation of section 110(5), as it defies the plain language of the statute. Section 110(5) does not say that a person, company, or other entity must own or operate only a single receiver to qualify for the exemption; it refers to "the communication of *a* transmission embodying *a* performance ... of *a* work" (emphasis added). We think it obvious that the language refers to a single location. "The statute does not ask how many receiving apparatuses were used to receive a number of different works. The language of the statute thus strongly suggests that the proper analysis should be limited to the area where a single work is performed." *Broadcast Music, Inc. v. Claire's Boutiques, Inc.,* 949 F.2d 1482, 1490 (7th Cir.1991).[3] If we were to embrace BMI's argument and reach the result it suggests, the equipment used in any Edison store, including those stores that have more sophisticated equipment, would be attributable to each of the other stores owned by Edison for purposes of the Copyright Act. Such a result does not comport with the statutory language.

■ We agree with the District Court "that it is not appropriate to focus on the number of stores involved, but rather on whether each store duplicates the requirements of the homestyle exception." *Edison Bros. Stores,* 760 F.Supp. at 770. There is no evidence in the record that any of Edison's unlicensed stores fail to meet the statutory criteria for entitlement to the section 110(5) exemption.

BMI claims that the legislative history of the exemption supports its multiple receiver argument. Our reading of the legislative history reveals nothing that convinces us that each store in a retail chain should not be considered for the homestyle exemption individually, as seems plain from the straightforward language of section 110(5). We certainly will not use the legislative history to which BMI directs our attention as a basis for reading into the statute limitations its language does not express. *See Union Bank v. Wolas,* — U.S. —, —, 112 S.Ct. 527, 530, 116 L.Ed.2d 514, 521 (1991) ("Given the clarity of the statutory text, respondent's burden of persuading us that Congress intended to create or to preserve a special rule [not expressed in the statutory language] is exceptionally heavy.").

## II.

BMI also bases its next argument on the legislative history of the enactment. BMI is not asking us to use legislative history to assist in clarifying an ambiguous statute; we are being asked to use legislative history to rewrite the section 110(5) exemption to add new requirements.

■ BMI contends that the physical size of Edison's stores removes the chain and its individual stores from the protection of the section 110(5) exemption.[4] In order to reach such a result, BMI would have us read into the exemption a requirement that total space in the stores must not exceed 1055 square feet, with the area open to the public not to exceed 620 square feet. Brief of Appellant at 9, 11. The basis for this argument is a Supreme Court decision in a copyright case antedating the enactment of section 110(5) and the Report of the House Judiciary Committee relating to that section.

In *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975), the Supreme Court had before it the issue of whether the proprie-

---

**3.** In *Broadcast Music, Inc. v. Claire's Boutiques, Inc.,* 949 F.2d 1482 (7th Cir.1991), the Seventh Circuit considered some of the same issues now before us and reached a result consistent with our decision today.

**4.** Edison asserts that the record on the size of its stores is inadequate for BMI to sustain this claim factually, regardless of its legal viability. *See* Brief of Appellee at 35 & n. 13. BMI, on the other hand, claims that the record demonstrates

the average square footage of Edison's unlicensed stores is 2268 square feet, with 800 to 1200 square feet open to the public. Reply Brief of Appellant at 18 n. 11. Clearly this is a disputed question of fact, but in view of our holding that a store's physical size is not a factor that requires consideration under the statute, it is irrelevant and does not require resolution in order for us to affirm the District Court's entry of summary judgment in favor of Edison.

tor of a food shop who installed and played a radio with four speakers on the premises of his business was required to pay licensing fees for the music thus provided for his patrons. The Court, holding that in so using a radio Aiken was not "performing" within the meaning of the Copyright Act, ruled that he was not. The House Report on the 1976 amendments to the Copyright Act suggests that the section 110(5) exemption was added to the Copyright Act in response to the Court's opinion in *Aiken*. H.R.Rep. No. 1476, 94th Cong., 2d Sess. 86–87 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5700–01. The Report indicates that the new exemption was intended to supersede the Court's holding in *Aiken* that the playing of a radio in a commercial establishment open to the public is not a "performance," and thus not an infringing act. At the same time, the Report suggests that on the facts of *Aiken* the Court's decision exempting Aiken from the payment of licensing fees was appropriate and deserving of codification.

The language from the Report upon which BMI focuses is this: "the Committee considers this fact situation [in *Aiken*] to represent the outer limit of the [homestyle] exemption, and believes that the line should be drawn at that point." *Id.* at 87, *reprinted in* 1976 U.S.C.C.A.N. at 5701. Even accepting *arguendo* the untenable proposition that we would give greater weight to what a House Committee "considers" than to the text the entire Congress enacts and the President signs, BMI neglects to point out that the "fact situation" described in the Report, which immediately precedes the above-quoted language, makes no mention of square footage: "Under the particular fact situation in the *Aiken* case, assuming a small commercial establishment and the use of a home receiver with four ordinary loudspeakers grouped within a relatively narrow circumference from the set, it is intended that the performances would be exempt under clause (5)." *Id.* Further, the "fact situation" as described in *Aiken* makes no mention of the square footage of Aiken's shop:

The respondent George Aiken owns and operates a small fast-service food shop in downtown Pittsburgh, Pa., known as "George Aiken's Chicken." Some customers carry out the food they purchase, while others remain and eat at counters or booths. Usually the "carry-out" customers are in the restaurant for less than five minutes, and those who eat there seldom remain longer than 10 or 15 minutes.

A radio with outlets to four speakers in the ceiling receives broadcasts of music and other normal radio programing at the restaurant. Aiken usually turns on the radio each morning at the start of business. Music, news, entertainment, and commercial advertising broadcast by radio stations are thus heard by Aiken, his employees, and his customers during the hours that the establishment is open for business.

*Aiken*, 422 U.S. at 152, 95 S.Ct. at 2042.[5]

BMI directs our attention to several opinions where, BMI maintains, the square footage of the establishment attempting to qualify for the exemption was discussed.[6]

**5.** Not only were square footage figures omitted from the Supreme Court's opinion in *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975), they also are nowhere to be found in either of the opinions from the courts below. *Twentieth Century Music Corp. v. Aiken*, 500 F.2d 127 (3d Cir.1974) (subsequent history omitted); *Twentieth Century Music Corp. v. Aiken*, 356 F.Supp. 271 (W.D.Pa.1973) (subsequent history omitted). Apparently, the dimensions of Aiken's shop first appeared in a published opinion in *Sailor Music v. Gap Stores, Inc.*, 516 F.Supp. 923, 924 (S.D.N.Y.), *aff'd*, 668 F.2d 84 (2d Cir.1981), *cert. denied*, 456 U.S. 945, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982), filed some five years after the enactment of section 110(5). There is no indication of the source of the information in the *Sailor* opinion.

**6.** *See, e.g., Broadcast Music, Inc. v. United States Shoe Corp.*, 678 F.2d 816 (9th Cir.1982) (square footage of the defendant stores was not even mentioned); *Broadcast Music, Inc. v. Jeep Sales & Serv. Co.*, 747 F.Supp. 1190 (E.D.Va.1990); *Hickory Grove Music v. Andrews*, 749 F.Supp. 1031 (D.Mont.1990); *Crabshaw Music v. K–Bob's of El Paso, Inc.*, 744 F.Supp. 763 (W.D.Tex.1990); *Merrill v. Bill Miller's Bar–B–Q Enters., Inc.*, 688 F.Supp. 1172 (W.D.Tex.1988); *Merrill v. County Stores, Inc.*, 669 F.Supp. 1164 (D.N.H.1987); *International Korwin Corp. v. Kowalczyk*, 665 F.Supp. 652 (N.D.Ill.1987), *aff'd*, 855 F.2d 375

Having reviewed these cases, we reject as totally inaccurate BMI's assertion that "in virtually every case the excessive square footage of the defendant's store alone was found to disqualify the defendant from invoking the Section 110(5) exemption." Brief of Appellant at 27 n. 14. The fact is that in none of these cases did the court base its decision solely on the square footage of the stores without considering the nature of the equipment, i.e., whether it was "homestyle," nor did any of them declare that they would have reached the same result based only upon the square footage of the infringing stores. Moreover, none of the cases cited has any binding precedential force in this Circuit.

The closest we come to Eighth Circuit precedent on this issue is this Court's dicta in *National Football League v. McBee & Bruno's, Inc.*, 792 F.2d 726 (8th Cir.1986), in which the challenged action was the receipt via satellite antenna of blacked-out NFL games and the playing of the broadcasts on television sets in bars. Although the Court noted that "[t]he factors listed in the legislative history do speak of the size of the area where the transmission will be played," *id.* at 731, the Court said nothing about a maximum square footage. Further, the Court stated that the 1976 legislative history indicates that "to decide whether an infringement had occurred, the critical question instead would be the type of equipment used by the putative infringer." *Id.* at 730. The Court also quoted this language from the legislative history of the exemption:

> the clause would exempt small commercial establishments whose proprietors merely bring onto their premises stan-

dard radio or television equipment and turn it on for their customers' enjoyment, but it would impose liability where the proprietor has a commercial 'sound system' installed or converts a standard home receiving apparatus ... into the equivalent of a commercial sound system.

*Id.* at 730–31 (quoting H.R.Rep. No. 1476, 94th Cong., 2d Sess. 87 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5701). Clearly, this passage from the legislative history directs attention to the quality of the sound system used, and not to the square footage of the establishment using it.[7]

Although the legislative history is interesting, it is beside the point; we need only look to the statute itself. If Congress intended to impose a physical size limitation on the establishment qualifying for the exemption, it might easily have written it into the statute. But it did not; it did not even qualify the exemption by limiting its availability to a "small commercial establishment," the language of the legislative history. The statute focuses on the equipment being used, and so must we. This Court is not a legislative body, and it has no authority to rewrite the statute.

The same observation applies fully to BMI's next argument: that the legislative history supports its contention that a section 110(5) exemption is available only if "the business [does] not have the ability to pay for its use of music or [is not] of sufficient size to justify, as a practical matter, a subscription to a commercial background music service." Brief of Appellant at 11. The legislative history BMI relies upon is this:

> the "for profit" limitation of the present statute. It applies to performances and displays of all types of works, and *its purpose is to exempt from copyright liability anyone who merely turns on, in a public place, an ordinary radio* or television receiving apparatus *of a kind commonly sold to members of the public for private use.*
> H.R.Rep. No. 1476, 94th Cong., 2d Sess. 86 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5700 (emphasis added). That summary of the exemption makes no mention of any size or financial restrictions.

---

(7th Cir.1988); *Rodgers v. Eighty Four Lumber Co.*, 617 F.Supp. 1021 (W.D.Pa.1985); *Springsteen v. Plaza Roller Dome, Inc.*, 602 F.Supp. 1113 (M.D.N.C.1985); *Sailor Music v. Gap Stores, Inc.*, 516 F.Supp. 923 (S.D.N.Y.), *aff'd*, 668 F.2d 84 (2d Cir.1981), *cert. denied*, 456 U.S. 945, 102 S.Ct. 2012, 72 L.Ed.2d 468 (1982).

7. If BMI wishes to base its argument here on language from the legislative history, it should also note the opening remarks of the portion of the House Report that discusses section 110(5):

> Unlike the first four clauses of section 110, clause (5) is not to any extent a counterpart of

It is the intent of the conferees that a small commercial establishment of the type involved in *Twentieth Century Music Corp. v. Aiken,* which merely augmented a home-type receiver and which was not of sufficient size to justify, as a practical matter, a subscription to a commercial background music service, would be exempt.

H.R.Conf.Rep. No. 1733, 94th Cong., 2d Sess. 75 (1976) (citation omitted), *reprinted in* 1976 U.S.C.C.A.N. 5810, 5816.[8]

The intent expressed in the report of the House conferees is irrelevant when the statutory language does not say or even imply that the size or financial wherewithal of the establishment has a bearing on eligibility for the homestyle exemption. As with the square footage requirement that BMI would have us read into the exemption, the opinions of other courts that mention this language do not persuade us that, even though Congress enacted the law without any such requirement, it truly intended a size-and-financial-means test to be a part of the statute. *See Claire's Boutiques,* 949 F.2d at 1492 ("no case has relied solely on the financial size or ability of the defendant as a reason for denying the application of § 110(5)"). Moreover, we surmise that any such requirement would surely run into constitutional problems for vagueness: who would determine when an establishment is "of sufficient size to justify … a subscription to a commercial background music service," and what criteria would they use?

We hold that 17 U.S.C. § 110(5) does not require that the square footage of a qualifying establishment be less than 1055, with fewer than 620 square feet open to the public; nor does it require that the entity's ability to pay for a commercial background music service be considered. The focus of the statute is on the equipment in use, and as each of Edison's unlicensed stores uses only homestyle equipment each qualifies for the homestyle exemption.

### III.

Finally, BMI argues that the District Court's decision defeats the purpose of the Copyright Act and conflicts with this country's international treaty obligations. We find no merit in BMI's contention that the District Court's interpretation of the statute expands the scope of the homestyle exemption beyond the intent of Congress. *See Aiken,* 422 U.S. at 163, 95 S.Ct. at 2047 ("exaction of such multiple tribute [by authorizing the sale of numerous licenses for a single broadcast of a copyrighted work] would go far beyond what is required for the economic protection of copyright owners, and would be wholly at odds with the balanced congressional purpose behind" the exclusive right of public performance) (footnote omitted). If Congress had intended the exemption to be limited so as to exclude large retail chain stores such as Edison, it might easily have shown that intention in the language of the statute. It did not and we will not assume that the omission was a mere oversight on the part of the legislators. We note there is here no contention, nor could there plausibly be, of a " 'scrivener's error' producing an absurd result." *Union Bank,* — U.S. at ——, 112 S.Ct. at 534, 116 L.Ed.2d at 525 (Scalia, J., concurring).

BMI's argument that this decision interferes with the international treaty obligations of the United States also fails.

---

**8.** BMI argues for expansion of this putative requirement and suggests that "of sufficient size to justify … a subscription to a commercial background music service," the language found in the legislative history (and only in the legislative history), equates with "able to afford a commercial background music service or to pay the license fee to a performing rights organization." *See* Brief of Appellant at 29 ("it is beyond dispute that Edison has the ability to compensate the creators and publishers of the music that it uses in its stores"). This expansion would take us even further afield from the statutory language. The Eighth Circuit dicta BMI quotes as support for its argument says nothing about ability to pay: "the question as a practical matter is whether the defendant establishment is of the size and kind that Congress would expect to obtain a license through a subscription music service." *Nat'l Football League v. McBee & Bruno's, Inc.,* 792 F.2d 726, 731 (8th Cir.1986) (decision denying section 110(5) exemption based primarily on the type of equipment used).

The treaty in question is the international copyright agreement known as the Berne Convention. Berne Convention for the Protection of Literary and Artistic Works, S. Treaty Doc. No. 27, 99th Cong., 2d Sess. (1986). The Convention, signed on September 9, 1886, as revised at Paris on July 24, 1971, entered into force for the United States on March 1, 1989. *See* Berne Convention Implementation Act of 1988, Pub.L. No. 100–568, § 13, 102 Stat. 2853, 2861 (1988). Congress then revised the Copyright Act (although section 110(5) was unaffected) and declared that the Act as amended "satisf[ies] the obligations of the United States in adhering to the Berne Convention and no further rights or interests shall be recognized or created for that purpose." *Id.* § 2(3), 102 Stat. 2853.

BMI asserts that the District Court's interpretation of section 110(5) to provide shelter for Edison under the homestyle exemption expands the scope of the exemption to such a degree that it renders section 110(5) in violation of the United States' treaty obligations under Article 11*bis* of the Berne Convention. Under that article, authors of artistic works have exclusive rights to authorize "the public communication by loudspeaker or any other analogous instrument transmitting, by signs, sounds or images, the broadcast of the work." Berne Convention, art. 11*bis*(iii), S. Treaty Doc. No. 27, 99th Cong., 2d Sess. 44 (1986). The flaw in BMI's argument is that the District Court's interpretation of section 110(5) does not expand the homestyle exemption, but merely declares that the statutory language means what it says. We cannot presume that Congress, in enacting this language, intended something else, and we know that Congress declared its handiwork to be consistent with the Berne Convention. Congress thus declared the public policy of the United States and, for us, that is the end of the matter.

Congress was emphatic that the United States' participation in the Berne Convention should not give rise to an expanded claim of copyright protection.

> No right or interest in a work eligible for protection under this title may be claimed by virtue of, or in reliance upon, the provisions of the Berne Convention, or the adherence of the United States thereto. Any rights in a work eligible for protection under this title that derive from this title, other Federal or State statutes, or the common law, shall not be expanded or reduced by virtue of, or in reliance upon, the provisions of the Berne Convention, or the adherence of the United States thereto.

17 U.S.C.A. § 104(c) (West Supp.1991). In view of this unmistakably clear congressional directive, BMI's claim to a "right or interest ... by virtue of ... the adherence of the United States" to the Berne Convention cannot be sustained.

The judgment of the District Court is affirmed.