**CASS COUNTY MUSIC COMPANY, Red Cloud Music Company, Jobete Music Co., Inc., Brockman Enterprises Inc., Colgems–EMI Music Inc., Stephen Mitchell Music, Anidraks Music, and Impulsive Music, Plaintiffs,**

v.

**VASFI MUEDINI d/b/a Port Town Family Restaurant, Defendant.**

Civ. A. No. 92–C–706.

United States District Court, E.D. Wisconsin.

April 7, 1993.

---

Jeffrey A. Brauch, Quarles & Brady, Milwaukee, WI, for plaintiffs.

Vasfi Muedini, pro se.

### ORDER

TERENCE T. EVANS, Chief Judge.

This is one of those rare lawsuits where the party that has done nothing is going to win the case. In most cases, a plaintiff files a claim, a defendant files a denial, and the parties duke it out in court where, unless they settle, the one standing at the end is declared to be the winner. In some cases, a plaintiff files a suit and a defendant, for whatever reason, fails to respond. That is what has happened here, and the plaintiffs now seek to win by default.

In default situations, courts usually grant the relief sought by the party bringing the suit. But this case is different. Because I think that to declare the plaintiffs the victor would be wrong, not to mention unfair, I decline to award them the prize. The defendant, despite the fact that he mounted no defense, will carry the day. My reasons follow.

This is a suit under Title 17, United States Code, in which the plaintiffs allege six causes of action for copyright infringement based on the defendant's "public performances of copyrighted musical compositions."

The plaintiffs are the owners of the copyrights to various songs. The defendant, Vasfi Muedini, is the owner of the Port Town Family Restaurant, located on Western Avenue in Racine, Wisconsin. Here's what the case is about.

The Port Town Family Restaurant is a small restaurant in Racine. It has 16 tables and 15 booths. On Saturday, March 13, 1992, the plaintiffs sent an investigator to the restaurant to, among other things, note how many patrons were present and determine if copyrighted music was being "performed." The investigator arrived at approximately 5 p.m. and stayed about 3½ hours. At 5:21 p.m. he reported that 62 patrons were present. That number dwindled to 20 by 8:22 p.m. There was no dancing, no admission was charged to enter the restaurant, and no jukebox was played. It seems as if nothing was going on except informal Saturday night dining. But, trouble was lurking because a radio was playing!

While the dining was taking place, music could be heard. The music was from Milwaukee radio station WMYX–99.1 FM, a station commonly called "The Mix" because it plays a variety of songs. The music was playing through nine 8″ speakers installed in the ceiling of the public portion of the restau-

rant. The music was coming from a Realistic Model No. STA–700 AM/FM stereo receiver-amplifier commonly sold at local Radio Shack stores. Included in the mix of music being played by the radio station during the evening of March 13 were the following six songs:

1. At 5:55 p.m., "You've Got a Friend," the Carole King classic, performed by the great James Taylor;
2. At 6:05 p.m., "Three Times a Lady," performed by Lionel Ritchie;
3. At 6:42 p.m., "Only the Good Die Young," by Billy Joel;
4. At 6:55 p.m., "Jump," by the Pointer Sisters;
5. At 7:27 p.m., "One of These Nights," performed by the Eagles;
6. At 8:09 p.m., "My Girl," by the incomparable Temptations.

The plaintiffs are the owners of the copyrights to the six songs. Because no license fee had been paid by the restaurant, the plaintiffs seek statutory damages of $1,000 for each of the six songs heard over the radio, an injunction, costs, and attorneys fees.

When I heard this case in a summary fashion at a scheduled default judgment hearing on February 2, I expressed surprise that the situation as presented violated the law. I asked the attorney for the plaintiffs to supply some authority on the point in addition to the matters already in the file. Additional material was filed, and I am still not convinced that the defendant has violated the law.

In their argument, the plaintiffs say:

Four recent reported decisions stand for the unassailable proposition that, in cases virtually identical to the instant one, plaintiffs are entitled to judgment awarding the relief they seek against defendants in default. *See, e.g., Coleman v. Payne,* 698 F.Supp. 704 (W.D.Mich.1988); *Golden Torch Music Corp. v. Pier III Cafe, Inc.,* 684 F.Supp. 772 (D.Conn.1988); *Halnat Publishing Co. v. L.A.P.A., Inc.,* 669 F.Supp. 933 (D.Minn.1987); *Music City Music v. Alfa Foods, Ltd.,* 616 F.Supp. 1001 (E.D.Va.1985).

The claim that the facts in the case before me are "virtually identical" to the situations presented in the four cited cases is an overstatement. As I read them, the only thing this case really has in common with the four cases cited is that the defendants in all five cases failed to respond to the complaints against them by filing a legal denial of liability.

In *Coleman,* the defendant was the owner of radio station WJPW in Rockford, Michigan. The station had a licensing agreement with ASCAP (a major holder of copyrights) which permitted the playing of copyrighted music over the air. The license expired for failure to pay the license fees, and the station nevertheless continued to play copyrighted music over the radio waves. On one day, at least 10 songs were played.

In the *Golden Torch* case, the defendant was a nightclub, the Pier III Cafe in Milford, Connecticut. The case is silent as to the facts, but the inference seems to be that music was played for dancing at the nightclub, ala Barry Manilow doing "Copa Cabana."

In *Halnat,* the defendants were the owners of the Glacial Trail Supper Club in Sunburg, Minnesota. Five copyright songs were performed one night by a live band without a license fee being paid.

In the *Music City* case, the defendant was the Best Western Virginia Inn in Richmond, Virginia. Like the *Golden Torch* case, the facts are scant, but it appears that records were played for dancing or "musical entertainment."

None of the four cited cases involved music merely played over the radio. In the present case, unlike the others cited, the defendant had no control over what songs would be played. To conclude that this situation violates the copyright laws would be too much of a stretch.

■ The Copyright Act gives a copyright holder exclusive rights in copyrighted works. These include the exclusive rights of public performance of musical works. *See* 17 U.S.C. § 106. Unlicensed performances which do not conflict with the exclusive

rights granted by the act do not infringe on the holder's rights. As the Supreme Court pointed out, "[n]o license is required by the Copyright Act, for example, to sing a copyrighted lyric in the shower." *Twentieth Century Music Corp. v. Aiken,* 422 U.S. 151, 155, 95 S.Ct. 2040, 2043, 45 L.Ed.2d 84 (1975).

In *Aiken,* the Court was faced with the issue of whether the use of a radio and speakers in a fast-food restaurant infringed on the exclusive rights of the owners of the copyrighted songs broadcast on the radio. The restaurant utilized a receiver with outlets to four speakers mounted in the ceiling. The Court noted that "the broadcast of a copyrighted musical composition by a commercial radio station [is] a public performance of that composition for profit—and thus an infringement of the copyright if not licensed." This, of course, is like the situation in *Coleman.* But the Supreme Court in *Aiken* noted that one who listens to the broadcast through the use of a radio receiver does not "perform" the composition. *Id.* at 161, 95 S.Ct. at 2046, citing *Fortnightly Corp. v. United Artists,* 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176 (1968), and *Teleprompter Corp. v. CBS,* 415 U.S. 394, 94 S.Ct. 1129, 39 L.Ed.2d 415 (1974). The Court then stated:

> To hold in this case that the respondent Aiken "performed" the petitioners' copyrighted works would thus require us to overrule two very recent decisions of this Court. But such a holding would more than offend the principles of *stare decisis;* it would result in a regime of copyright law that would be both wholly unenforceable and highly inequitable.

*Id.,* 422 U.S. at 162, 95 S.Ct. at 2046-47. The Court stated that such a holding would be unenforceable because of the large number of business establishments with radio or television sets, and inequitable because it would authorize "the sale of an untold number of licenses for what is basically a single public rendition of a copyrighted work." *Id.* at 162-63, 95 S.Ct. at 2047.

The Supreme Court's rationale for its holding in *Aiken* was that the restaurant engaged in no "performance" of the music. In 1976, Congress amended the Copyright Act to change the rationale of *Aiken.* The legisla-

tion did not, however, alter *Aiken*'s result. Under the amendment, which I'll get to soon, a "performance" occurred when the radio was played in the restaurant but, due to a statutorily created exception, no license was required for the performance.

The 1976 exemption provides:

> [C]ommunication of a transmission embodying a performance or display of a work by the public reception of the transmission on a single receiving apparatus of a kind commonly used in private homes [does not constitute a copyright infringement], unless—
>
> > (A) a direct charge is made to see or hear the transmission; or
> >
> > (B) the transmission thus received is further transmitted to the public.

17 U.S.C. § 110(5). This provision is discussed in the Report of the House Committee on the Judiciary:

> [I]ts purpose is to exempt from copyright liability anyone who merely turns on, in a public place, an ordinary radio or television receiving apparatus of a kind commonly sold to members of the public for private use.
>
> The basic rationale of this clause is that the secondary use of the transmission by turning on an ordinary receiver in public is so remote and minimal that no further liability should be imposed....

> It is the intent of the conferees that a small commercial establishment of the type involved in [*Aiken*], which merely augmented a home-type receiver and which was not of sufficient size to justify, as a practical matter, a subscription to a commercial background music service, would be exempt. However, where the public communication was by means of something other than a home-type receiving apparatus, or where the establishment actually makes a further transmission to the public, the exemption would not apply....

> Under the particular fact situation in the *Aiken* case, assuming a small commercial establishment and the use of a home receiver with four ordinary loudspeakers grouped within a relatively narrow circumference from the set, it is intended that the

performances would be exempt under clause (5). However, the Committee considers this fact situation to represent the outer limit of the exemption, and believes that the line should be drawn at that point. Thus, the clause would exempt small commercial establishments whose proprietors merely bring onto their premises standard radio or television equipment and turn it on for their customers' enjoyment, but it would impose liability where the proprietor has a commercial "sound system" installed or converts a standard home receiving apparatus (by augmenting it with sophisticated or extensive amplification equipment) into the equivalent of a commercial sound system. Factors to consider would include the size, physical arrangement, and noise level of the areas within the establishment where the transmissions are made audible or visible, and the extent to which the receiving apparatus is altered or augmented for the purpose of improving the aural or visual quality of. the performance for individual members of the public using those areas.

H.R.Rep. No. 94–1476, 94th Cong.2d Sess. 86, 87 (1976), *reprinted in* 1976 U.S.Code Cong. & Admin.News 5659, 5700, 5701 and 17 U.S.C.A. pp. 145, 148–149 (1977).

*Broadcast Music, Inc. v. Claire's Boutiques, Inc.*, 949 F.2d 1482 (7th Cir.1991), is instructive on the issue presented in this case. The Broadcast Music corporation, like the plaintiffs here, owned copyrights to many songs commonly played over the radio. The Claire's Boutique corporation owned 749 retail stores around the country. Most of the stores sold women's accessories and some also sold various games and novelty items.

Claire's stores ranged in size from 458 square feet to 3,300 square feet. During 1990, Claire's had net sales of $168,674,000. With the exception of approximately 65 stores, Claire's stores received radio broadcasts during all hours they were open. The equipment in each store included a 5-watt stereo receiver, an indoor antenna, two speakers, and speaker wire. The same equipment was also used in Claire's warehouse, which was approximately 10,000 square feet in size.

The receiver used by Claire's was a Radio Shack Optimus STA–20 AM/FM receiver. It had jacks that allowed the connection of speakers. The speakers were Realistic Minimus 7 speakers sold by Radio Shack. They measured 6″ by 6″ by 8″ and were hung from the ceiling. Altogether, Claire's owned and operated at least 669 receivers and 1,338 speakers in its stores.

The court of appeals for this circuit, after a comprehensive discussion of the law, concluded that Claire's did not need a license to play its radios. Claire's was exempt, the court found, under the section 110(5) exception.

Now, if Claire's chain stores are exempt, why should the little Port Town Family Restaurant here be liable? It should not. To say that Port is liable because it has nine speakers and the shops in Claire's had two (or four in *Aiken*) would be silly. Sophisticated "home entertainment" systems today often have multiple speakers to permit sound to be heard in various areas of a home. Although nine speakers in a home would be quite a few, that number would not be unprecedented.

More important than the number, size, spacing, and configuration of the speakers, I believe it makes more sense in cases like this to look to the type of receiving device used to receive the music and the type of place receiving the signal.

As to the first consideration, it should be noted that speakers are not mentioned in the section 110(5) exemption. Instead, the statute exempts "a single receiving apparatus of a kind commonly used in private homes...." The Port Town Family Restaurant's Realistic Model No. STA–700 AM/FM stereo receiver fits under this definition.

As to the type of place playing the radio, the restaurant here is not unlike the restaurant in *Aiken* or the shops in *Claire's*. Given the fact that a radio station (like "The Mix" here) has already presumptively paid a licensing fee to play its music, small business establishments like the Port Town Family Restaurant should not have to add to that royalty. One would think that Lionel Ritchie, Billy Joel, the Eagles, and the other

artists here should be content with only one payment per performance.

For these reasons, I decline to grant the plaintiffs' motion for a default judgment. If the plaintiffs want to convert this order into a judgment dismissing the case so they can appeal, they should let me know, and I will do so.

SO ORDERED.