**CASS COUNTY MUSIC COMPANY, et al., Plaintiffs–Appellants,**

v.

**Vasfi MUEDINI d/b/a Port Town Family Restaurant, Defendant–Appellee.**

**No. 93–3109.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 15, 1994.

Decided May 16, 1995.

**264**

Jeffrey A. Brauch, Michael J. Gonring, Quarles & Brady, Milwaukee, WI, Richard H. Reimer (argued), A.S.C.A.P., Legal Department, I. Fred Koenigsberg, White & Case, New York City, for plaintiffs-appellants Cass County Music Co., Red Cloud Music Co., Jobete Music Co., Inc., Colgems–EMI Music, Inc., Stephen Mitchell Music, Anidraks Music, Impulsive Music, Brockman Enterprises, Inc.

Vasfi Muedini, Port Town Family Restaurant, Racine, WI, for appellee Vasfi Muedini, dba Port Town Family Restaurant.

E. Leonard Rubin (argued), William Cook, Barry F. Irwin, Willian, Brinks, Hofer, Gilson & Lione, Chicago, IL, for amicus curiae Willian, Brinks, Hofer, Gilson & Lione.

Before COFFEY, RIPPLE and ROVNER, Circuit Judges.

RIPPLE, Circuit Judge.

The plaintiffs, Cass County Music Company and seven other music publishers, appeal the district court's grant of summary judgment in favor of the defendant, Vasfi Muedini, a defaulting party.[1] At this court's request, the law firm of Willian Brinks Hofer Gilson & Lione submitted an amicus curiae brief in support of the judgment of the district court.[2] For the following reasons, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

## I

## BACKGROUND

The plaintiffs, Cass County Music Company, Red Cloud Music Company, Jobete Music Company, Inc., Brockman Enterprises, Inc., Colgems–EMI Music, Inc., Stephen Mitchell Music, Anidraks Music, and Impulsive Music, own copyrights to six songs that are the subject of this suit.[3] At the time the suit was brought, the defendant, Vasfi Muedini, was the owner of the Port Town Family Restaurant located in Racine, Wisconsin.[4] The res-

---

**1.** The defendant did not file an appearance or a pleading in the district court, and has not entered an appearance in this court or filed a brief.

**2.** In preparing its brief, amicus conducted an independent investigation that included visiting the Port Town Family Restaurant, now under new ownership and known as the River Run Restaurant. Amicus also met with the Director of Legal Services, American Society of Composers, Authors, and Publishers ("ASCAP"). ASCAP is a performing rights licensing organization in which members are granted the nonexclusive right to license non-dramatic public performances of their copyrighted musical works. Amicus utilized, and appended to their brief, supplemental references, including recent news articles discussing developments in radio and speaker technology and a 1994 Radio Shack Catalog advertising various transformers, radios and speakers. Because we review this case, in the context of a default, all facts of record are presumed true. Any supplemental facts, true or not, provided by amicus cannot be considered. *See United States ex rel. Jones v. Franzen*, 676 F.2d 261, 266 n. 7 (7th Cir.1982) (declining to consider amicus' numerous statements of fact not supported in the unchallenged record). Our review is limited to the record before the district court.

**3.** The plaintiffs are all members of ASCAP. The purpose of ASCAP is to "reduce the transactional and enforcement costs that would otherwise be incurred in reaching agreements with each individual copyright holder." *Chi–Boy Music v. Charlie Club, Inc.*, 930 F.2d 1224, 1226 n. 1 (7th Cir.1991) (citing *Broadcast Music, Inc. v. Columbia Broadcasting Sys.*, 441 U.S. 1, 4–5, 99 S.Ct. 1551, 1554–55, 60 L.Ed.2d 1 (1979)).

**4.** Because the plaintiffs seek monetary damages, the fact that injunctive relief may not be available because of the change in ownership does not moot the case. *Fulani v. Hogsett*, 917 F.2d 1028 (7th Cir.1990), *cert. denied*, 501 U.S. 1206, 111 S.Ct. 2799, 115 L.Ed.2d 972 (1991); *see Forbes v. Arkansas Educ. Television Communication Network Found.*, 982 F.2d 289, 289 (8th Cir.1992) (per curiam) ("The underlying case is not moot. The complaint contains a prayer for money damages."); *Association of Flight Attendants, AFL–CIO v. Delta Air Lines, Inc.*, 879 F.2d 906, 909 (D.C.Cir.1989) ("Even though a claim for injunctive or declaratory relief has been rendered moot by intervening events ... a claim for damages keeps the controversy alive[.]") (citation omitted), *cert. denied*, 494 U.S. 1065, 110 S.Ct. 1781, 108 L.Ed.2d 783 (1990); *see also Church of Scientology v. United States*, —— U.S. ——, ——,

taurant is a free-standing building accommodating up to 128 patrons with a public dining area of approximately 1500 square feet. The restaurant is equipped with a "radio-over-speaker" sound system that provides for a consistent level of background music throughout the dining area.

On the night of March 13, 1992, two investigators employed by ASCAP had dinner in the Port Town Family Restaurant. While dining, the investigators heard some of the plaintiffs' songs played over the restaurant's sound system.[5] The source of the music was a radio broadcast of WMYX–FM, a Milwaukee station. The radio station is an ASCAP licensee. The license between ASCAP and WMYX–FM prohibits retransmissions of the station's broadcasts. The license provides:

> Nothing in this agreement shall be construed as granting, or as authorizing Licensee to grant to others any right to perform publicly . . . any of the musical compositions licensed under this agreement, or as authorizing any receiver of any radio broadcast to perform publicly or reproduce the same in any manner.

As of April 1993, ASCAP had licensed 151 Wisconsin establishments where, like the Port Town Family Restaurant, the only entertainment was mechanical music.[6] The licensing fee for establishments that play music four to seven nights a week and seat between 76 and 150 patrons is $327 per year. From May 1985 until December 1991, ASCAP repeatedly and unsuccessfully approached the Port Town Family Restaurant about the need for the restaurant to obtain an ASCAP license in order to continue legally to play background music.

The plaintiffs subsequently brought this action against Muedini. They alleged copyright infringement on the basis of the public performance of the six copyrighted musical compositions. The plaintiffs requested an injunction prohibiting further performances, $1000 damages for each infringement, and costs, including reasonable attorneys' fees.

Muedini did not respond to the complaint, and the plaintiffs, therefore, moved for the entry of a default judgment. At the hearing that followed, the district court expressed doubt as to Muedini's liability and requested that the plaintiffs brief the issue of the applicability of the § 110(5) exemption of the United States Copyright Act, 17 U.S.C. § 101 *et seq.* After reviewing the relevant case law and additional authorities, the district court denied the plaintiffs' motion for default judgment. *Cass County Music Co. v. Muedini,* 821 F.Supp. 1278 (E.D.Wis.1993). The court held that the restaurant owner was statutorily exempt from the Act's requirement that he obtain a license to play copyrighted works. *Id.* at 1279. The plaintiffs requested reconsideration of the decision. A hearing was granted, but the district court declined to reverse its earlier decision, and entered judgment dismissing the case. The plaintiffs appeal.

II

DISCUSSION

As we have noted earlier, the defendant declined to participate in this litigation. The district court was thus confronted with a default. The court correctly realized that, in such a situation, it was not appropriate simply to enter judgment for the plaintiffs. Rather, it was necessary that the plaintiffs demonstrate that they were entitled to judgment as a matter of law. In making this inquiry, the court must assume that the fac-

---

113 S.Ct. 447, 450, 121 L.Ed.2d 313 (1992) (holding that even when it is no longer possible to return the parties to the status quo ante, a case is not moot if the court can fashion "some form of meaningful relief"). Whether the injunctive relief sought can be enforced against Muedini's successor presents a question for determination in a subsequent proceeding.

**5.** The six infringing performances were: (1) At 5:55 p.m., "You've Got a Friend," written by Carole King and performed by James Taylor; (2)

At 6:05 p.m., "Three Times a Lady," written and performed by Lionel Ritchie; (3) At 6:42 p.m., "Only the Good Die Young," written and performed by Billy Joel; (4) At 6:55 p.m., "Jump," by the Pointer Sisters; (5) At 7:27 p.m., "One of These Nights," performed by the Eagles; and (6) At 8:09 p.m., "My Girl," by the Temptations.

**6.** The term "mechanical music" refers to radio, tapes or compact discs being played over loudspeakers.

tual allegations are, by reason of the default, true.

### A.

The Copyright Act of 1976[7] grants copyright owners the exclusive right to control the public performance of their works. 17 U.S.C. § 106(4). The Act defines public performance so that it includes the playing of a radio or television broadcast in a business establishment:

> To perform or display a work "publicly" means—
>
> (2) to transmit or otherwise communicate a performance or display of the work to ... the public, by means of any device or process, whether the members of the public capable of receiving the performance or display receive it in the same place or in separate places and at the same time or at different times.

17 U.S.C. § 101.

Section 110(5) of the Act provides an exception for small commercial establishments that play radio or television broadcasts on a "homestyle receiving apparatus." In pertinent part § 110(5) provides:

> Notwithstanding the provisions of section 106, the following are not infringements of copyrights:
>
> .   .   .   .   .
>
> (5) communication of a transmission embodying a performance or display of a work by the public reception of the transmission on a single receiving apparatus of a kind commonly used in private homes, unless—
>
> (A) a direct charge is made to see or hear the transmission; or

(B) the transmission thus received is further transmitted to the public;[8]

17 U.S.C. § 110(5).

In *Broadcast Music, Inc. v. Claire's Boutiques, Inc.*, 949 F.2d 1482 (7th Cir.1991), *cert. denied*, 504 U.S. 911, 112 S.Ct. 1942, 118 L.Ed.2d 547 (1992), this court, through the pen of Judge Cummings, extensively reviewed and analyzed § 110(5) and its legislative history. The court noted that the Congress included the small business exemption in response to the Supreme Court's decision in *Twentieth Century Music Corp. v. Aiken*, 422 U.S. 151, 95 S.Ct. 2040, 45 L.Ed.2d 84 (1975). In *Aiken*, the Supreme Court had held that a restaurant owner's simple act of turning on a radio for the listening pleasure of his patrons did *not* constitute a performance for which a license could be required. *Id.* at 162, 95 S.Ct. at 2047. Writing for the Court, Justice Stewart noted the "practical unenforceability of a ruling that all of those in Aiken's position are copyright infringers." *Aiken*, 422 U.S. at 162, 95 S.Ct. at 2047. He noted the pragmatic implications of a contrary decision:

> One has only to consider the countless business establishments in this country with radio or television sets on their premises—bars, beauty shops, cafeterias, car washes, dentists' offices, and drive-ins—to realize the total futility of any evenhanded effort on the part of copyright holders to license even a substantial percentage of them.

*Aiken*, 422 U.S. at 162, 95 S.Ct. at 2047.

In response to *Aiken*, the Congress defined "performance" in the 1976 Act to include playing works by means of a device such as a radio. Nevertheless, the Congress also included an exemption for small commercial establishments. Thus, although the

---

7. 17 U.S.C. § 101 *et seq.*

8. Under the Copyright Act, to "transmit" a performance is "to communicate it by any device or process whereby images or sounds are received beyond the place from which they are sent." 17 U.S.C. § 101. In *Broadcast Music, Inc. v. Claire's Boutiques, Inc.*, this court rejected the appellant's argument that "the fact that the receiver is placed in a back room separate from the selling area means that the music is further transmitted." 949 F.2d 1482, 1495 (7th Cir.

1991), *cert. denied*, 504 U.S. 911, 112 S.Ct. 1942, 118 L.Ed.2d 547 (1992). The court concluded that "further" transmission requires more than running speaker wire through a wall. *Id.* It "entail[s] the use of some device or process that expands the normal limits of the receiver's capabilities." *Id.* Because we decide the issue on other grounds, whether the Port Town Family Restaurant is further transmitting the broadcasts need not be addressed.

Congress changed the definition of "performance" used by the Court in *Aiken,* it acknowledged its practical wisdom in exempting the playing of a single radio:

> The § 110(5) exemption will allow the use of ordinary radios and television sets for the incidental entertainment of patrons in small businesses or other professional establishments, such as taverns, lunch counters, hairdressers, dry cleaners, doctors' offices, etc.

*See* S.Rep. No. 983, 93d Cong., 2d Sess. 130 (1974). In *Claire's Boutiques,* the sound system installed consisted of a "Radio Shack Optimus STA–20 5–watt stereo receiver, two Realistic Minimus 7 speakers, an indoor antenna, and speaker wire." 949 F.2d at 1485. The receiver was kept in the back storage room, and two strands of speaker wire ran from the receiver to the speakers, which were mounted inconspicuously on the ceiling. *Id.* The speakers were approximately five to fifteen and twenty to thirty-five feet from the receiver, respectively. *Id.* Keeping in mind the Congress' intent to exempt small commercial establishments,[9] this court delineated a four-part test for application of the § 110(5) exemption: "the exemption is available only if (1) a single receiving apparatus is used, (2) the single receiving apparatus is of a kind commonly used in private homes, (3) the transmission is provided free of charge, and (4) the transmission is not 'further transmitted' to the public." 949 F.2d at 1489.[10]

Additionally, the court found the physical size of the establishment "relevant as indicative of the reach of a stereo system." 949 F.2d at 1494.[11] The focus, we stressed, must be on the entire audio reproduction system. *Id.* at 1493. If the Congress had wanted the review to be limited to the receiver, it would have used the word "receiver" and not "receiving apparatus." Apparatus signifies "the totality of means by which a designated function is performed ... [or] a group of machines used together ... to accomplish a task." *Id.* (quoting *American Heritage Dictionary* 120 (2d ed. 1982)).

Elaborating on the application of this "entire system" approach, *Claire's Boutiques* identified two ways in which an establishment could fall outside the exemption created by § 110(5). First, if any non-home-type components are used, then the entire system must be considered a non-home-type system. *Id.* Second, if the establishment has configured the home-type equipment in a way not commonly used in a home, the exemption is lost. *Id.* The critical factors are the "type and sophistication of the equipment used, the size of the area in which the broadcast is audible, and whether the equipment has been altered, augmented, or integrated in some fashion." *Id.* at 1494. Further, it is notable whether the speakers and speaker wire were concealed. *Id.*[12]

9. *See* H.R.Rep. No. 1476, 94th Cong., 2d Sess. 87 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5701 (noting that the facts of *Aiken,* in which radio programs were played by means of a radio receiver connected to four speakers in the shop's ceiling, represented the "outer limit" of the exception).

10. In applying these criteria, the court also determined that under the exemption, a "single receiving apparatus" should be limited to each individual store. 949 F.2d at 1490–91. The court noted that the language of the statute addressed only *one performance of one work. Id.* at 1490. The court then held that the Congress intended simply to "foreclose the unlicensed playing of more than one receiver at a single geographic site." *Id.* Therefore, chain stores, like Claire's Boutique, would be able to qualify under the § 110(5) exemption.

Second, the court found that § 110(5) could apply to large profitable businesses because the financial size of the business was irrelevant for § 110(5) exemption purposes; however, the physical size of the establishment was significant because it was "indicative of the reach of a stereo system." *Id.* at 1494 & n. 13. The court determined that it would be contrary to the language and intent of the statute to consider the financial capabilities of a business as a factor under a § 110(5) exemption.

11. *But cf. Edison Bros. Stores v. Broadcast Music, Inc.,* 954 F.2d 1419, 1424 (8th Cir.) (rejecting the size of the establishment as a decisive factor in light of the fact that the Congress "did not even qualify the exemption by limiting its availability to a 'small commercial establishment' "), *cert. denied,* 504 U.S. 930, 112 S.Ct. 1995, 118 L.Ed.2d 590 (1992).

12. *Cf. Edison Bros.,* 954 F.2d at 1424 (looking to the quality of the sound system used and not to the square footage of the establishment using it or the entity's ability to pay for a commercial background music service).

In evaluating the record before it, the court in *Claire's Boutiques* determined that Claire's Boutiques remained within the exemption. *Id.* at 1494. The system was comprised of home-type components, and was configured in a way not uncommonly found at a home. *Id.* at 1493–94. Only two speakers were used; they were located close to the receiver, and there was a lack of integration of "other technologies" in the system. *Id.* at 1493. The sound system employed by Claire's was a "receiving apparatus" comprised of home-type components, which were not augmented or altered; the transmission was free of charge, and was not "further transmitted" to the public.

### B.

In applying the factors delineated in *Claire's Boutiques* to the present case, we conclude that the first and third requirements of the § 110(5) exemption are met. The Port Town Family Restaurant's sound system is comprised of a single receiving apparatus, and no fee is charged to the public to hear the music. It is, however, the second requirement—that an apparatus must be of the kind commonly used in a private home—upon which we must focus. The district court concentrated on the restaurant's receiver, and reasoned:

> More important than the number, size, spacing, and configuration of the speakers, I believe it makes more sense in cases like this to look to the type of receiving device used to receive the music and the type of place receiving the signal.

*Cass County,* 821 F.Supp. at 1282. The restaurant's sound system utilizes a Realistic brand receiver, Model No. STA–700 AM/FM, sold at Radio Shack for approximately $200. The district court concluded that this model was the type of receiver that commonly would be used in private homes. *Id.* The district court believed that a small restaurant should not be liable when each store in the conglomerate retail chain, Claire's Boutique, fell within the exception. The court stated:

> To say that Port is liable because it has nine speakers and the shops in Claire's only had two (four in *Aiken* ) would be silly. Sophisticated "home entertainment"

systems today often have multiple speakers to permit sound to be heard in various areas of a home. Although nine speakers in a home would be quite a few, that number would not be unprecedented. *Id.*

We find ourselves in respectful disagreement with the conclusion of the district court. In our view, *Claire's Boutiques* requires a different result. In *Claire's Boutiques,* we held that, in determining what qualified as "a single receiving apparatus," the entire sound system at a single location should be examined. *Claire's Boutiques,* 949 F.2d at 1493. The record makes clear that the system in place at the Port Town Family Restaurant is more sophisticated than the individual system in *Claire's Boutiques.* It cannot be characterized fairly as composed of only home-type components, nor can it be said to be configured in a manner commonly found in a home. *Id.* The Port Town music system utilizes, in addition to the Radio Shack receiver, a separate control panel containing five selector switches, nine speakers recessed into the dropped acoustic tile ceiling, and concealed wiring. Each speaker consists of a 12″ aluminum grille, an 8″ loudspeaker, and a 70 volt (70–V) loudspeaker line matching transformer. The total rated power output of the receiver utilized by the restaurant is 40 watts per channel. Without the addition of the transformers, the receiver is designed to drive only four speakers over moderate lengths of speaker cable. However, with the 70–V transformer attached to each speaker, the nominal impedance load level presented to the amplifier in the receiver is increased (from 8 ohms to approximately 10,000 ohms), consequently allowing for the use of small and moderate gauge speaker cable runs of up to 1000 feet without appreciable signal degradation. Additionally, because of the implementation of the transformers in the system configuration, the receiver effectively can power up to forty speakers wired in parallel, thirty-six speakers more than the receiver was designed to handle without overloading. R. 13, Ex. A. As the court noted in *Claire's Boutiques,* the extent to which a system is augmented for the purpose of improving the performance is a relevant factor to consider. *Id.* at 1494. The nine speakers are evenly spaced within the 1500 square foot dining

area. The parallel wiring of the speakers allows for easy installation of additional speakers at a later date. The set-up, known as a distributed 70 volt system, provides background music that is consistent and evenly audible throughout the public seating area.[13]

Although the system in *Aiken*—characterized by the congressional committee as the "outer limit" of the exception[14]—used four speakers, we need not decide today whether a certain number of speakers is the absolute limit that may be attributed to a "homestyle" set. What is "a single receiving apparatus of a kind commonly used in private homes" must be determined on a case-by-case basis. *Cf. Broadcast Music, Inc. v. U.S. Shoe Corp.*, 678 F.2d 816, 817 (9th Cir.1982) (noting that a person of "ordinary intelligence" could understand the phrase "commonly used in private homes" and finding that phrase did not render Act void for vagueness). As the district court believed, there may be households in the United States in which a system similar to the one employed here can be found. It is important to note, however, that, under the prevailing test articulated in *Claire's Boutiques*, the focus must be on whether the system, as installed and operated, is commonly found in homes. The system at issue here, when assessed in its totality, cannot be characterized fairly as such a system. The receiver clearly is used beyond the normal limits of its capabilities. Accordingly, the Port Town Family Restaurant is not exempt under § 110(5).

### Conclusion

For the foregoing reasons, we reverse the ruling of the district court and remand for entry of judgment for the plaintiffs and the determination of the appropriate relief.

REVERSED AND REMANDED

---

**13.** Because this case comes to us following a default by the defendant, all facts asserted by the plaintiff, such as the audibility of the music throughout the entire 1500 square foot space, are presumed true.

**14.** H.R.Rep. No. 1476, 94th Cong., 2d Sess. 87 (1976), *reprinted in* 1976 U.S.C.C.A.N. 5659, 5701.